IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MALLALIEU-GOLDER :
INSURANCE AGENCY, INC., :
 :  No. 4:CV-03-1155
  Plaintiff, :
 :  (Judge McClure)
  v. :
 :
EXECUTIVE RISK INDEMNITY, :
INC., and PREMIUM FINANCE :
TRUST INVESTORS FUND, :
 :
  Defendants. :

# M E M O R A N D U M

August 9, 2006

## BACKGROUND:

This is an action whereby plaintiff Mallalieu-Golder Insurance Agency, Inc. ("MG") seeks a declaratory judgment that Executive Risk Indemnity, Inc. ("Executive Risk") has an obligation to defend and indemnify MG under an insurance agents and insurance brokers professional liability policy, Policy No. 501-178510-99 (the "Policy"), with respect to a number of class action lawsuits brought by various investors in the Lycoming County Court of Common Pleas against MG and the Premium Finance Trust ("PFT"), a mysterious entity that held itself out as a wholly-owned subsidiary of MG. More than one year ago, we denied Executive Risk's motion for judgment on the pleadings. (Rec. Doc. No. 42.) Now

before the court is Executive Risk's motion for summary judgment.  The motion is

fully briefed and ripe for our consideration.[1]  We explain our decision to grant the

motion below.

## DISCUSSION:

### I.  Applicable Law

1.    Summary Judgment Standard

A district court may properly grant a motion for summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

---

[1]Although it played no part in our decision on the merits, we note our

disappointment with the parties' failure to comply with the Local Rules for the

United States District Court for the Middle District of Pennsylvania.  Neither party

complied with Local Rule 5.1(c).  More importantly, defendant Executive Risk

failed to comply with Rule 7.8(b), which imposes a 15-page limit on the length of

pretrial briefs.  Executive Risk's brief in support of its motion for summary

judgment is 27 pages long.  We will rule on the motion despite this noncompliance

with the Local Rules so as not to punish the parties for the failures of counsel.

P. 56(c).  The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue of material fact is one that may reasonably be resolved in favor of either party.  Id.  "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other."  Id.  In determining whether there is a disputed issue of material fact, the court will draw all reasonable inferences and any ambiguities in favor of the nonmoving party.  Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 578 (3d Cir. 1995) (citation omitted).

The party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

nonmoving party "has the duty to set forth specific facts showing that a genuine

issue of material fact exists and that a reasonable factfinder could rule in its favor."

Ridgewood Bd. Of Educ. v. N.E. ex rel. M.E., 173 F.3d 238, 252 (3d Cir. 1999)

(citations omitted); see also Fed. R. Civ. P. 56(e).  "Speculation and conclusory

allegations do not satisfy this duty."  Ridgewood Bd. Of Educ., 173 F.3d at 252

(citation omitted).  Furthermore, the "mere existence of a scintilla of evidence in

support of the [nonmoving party's] position will be insufficient."  Anderson, 477

U.S. at 252.

2.    Pennsylvania Law Applies

        Jurisdiction in this case rests on the diversity of the parties.  28 U.S.C.

§ 1332(a)(1).  A federal court sitting in diversity must apply the substantive law of

the state in which it sits, Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938),

including its choice of law rules, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S.

487, 496 (1941).  There is no dispute that Pennsylvania law applies.

        The United States Court of Appeals for the Third Circuit set forth a

summary of the general rules Pennsylvania courts have applied in construing

insurance policies in Jacobs Constructors, Inc. v. NPS Energy Servs., Inc., 264

F.3d 365, 375-76 (3d Cir. 2001).  We repeat that discussion here.

        First, the court must "ascertain the intent of the parties as manifested by the

language of the policy." <u>Standard Venetian Blind Co. v. Am. Empire Ins. Co.</u>, 469 A.2d 563, 566 (Pa. 1983).  In doing so, an insurance policy must be read as a whole and its terms, when unambiguous, must be construed according to their plain and ordinary meaning.  <u>See</u> <u>Pa. Mfrs.' Ass'n Ins. Co. v. Aetna Cas. & Sur. Ins. Co.</u>, 233 A.2d 548, 551 (Pa. 1967); <u>see also</u> <u>Koval v. Liberty Mut. Ins. Co.</u>, 531 A.2d 487, 489 (Pa. Super. Ct. 1987).  Where a provision is ambiguous, it must be construed in favor of the insured.  <u>See</u> <u>Standard Venetian Blind Co.</u>, 469 A.2d at 566.  A provision is ambiguous if reasonable persons, after considering the context of the entire policy, would honestly differ as to its meaning.  <u>See</u> <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 814 (3d Cir. 1994).  However, the court should read the policy to avoid ambiguities and not torture the language so as to create them.  <u>See</u> <u>St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.</u>, 655 F.2d 521, 524 (3d Cir. 1981).

An insurer's duty to defend arises "whenever the complaint filed by the injured party may potentially come within the policy's coverage." <u>Pacific Indem. Co. v. Linn</u>, 766 F.2d 754, 760 (3d Cir. 1985).  If the factual allegations of the complaint, taken as true, state a claim to which the policy potentially applies, the insurer must defend the case until it [can] confine the claim to a recovery that the policy [does] not cover." <u>Cadwallader v. New Amsterdam Cas. Co.</u>, 152 A.2d

484, 488 (Pa. 1959).  To determine whether a claim may be covered, the court must

ascertain the scope of the insurance coverage, and then analyze the allegations in

the complaint.  See Britamco Underwriters, Inc. v. Grzeskiewicz, 639 A.2d 1208,

1210 (Pa. Super. Ct. 1994).

An insurer's duty to defend is separate and distinct from its duty to

indemnify.  See Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368

(1987).  The duty to defend is broader than a duty to indemnify.  The duty to

indemnify arises only when the insured is found to be liable for damages covered

by the policy.  The burden of proving that a particular claim falls within the

coverage of a policy is on the insured.  See id. at 1366-67.

## II.  Statement of Facts

2.    Introduction

In compliance with Local Rule 56.1, Executive Risk submitted a short and

concise statement of material facts, complete with citations to the record, and MG,

along with defendant Premium Finance Trust Investors Fund ("PFTIF"),[2] filed a

---

[2]The PFTIF was added as a defendant pursuant to Pennsylvania law.  The

PFTIF is an association of the class action plaintiffs in the first Marshall action

(described in part II § 4 of this memorandum, infra), which secured a judgment of

joint response[3] to this statement of material facts.  We draw our statement of facts chiefly from those statements of Executive Risk that were admitted by MG and PFTIF.

MG seeks a declaratory judgment that Executive Risk has an obligation to defend and indemnify MG under an insurance agents and insurance brokers professional liability policy, Policy No. 501-178510-99 (the "Policy"), with respect to a number of class action lawsuits brought by various investors in the Lycoming County Court of Common Pleas against MG and PFT, which held itself out as a wholly-owned subsidiary of MG.  To decide the coverage issue, it is necessary to understand the actions of MG and PFT that led to the underlying class action lawsuits.

_____

$6.6 million against MG and PFT in the Lycoming County Court of Common Pleas.

[3]Along with their joint response, MG and PFTIF submitted three exhibits. (Rec. Doc. No. 55.)  The first two are short and scattered excerpts from depositions which are generally unhelpful to the court due to the lack of context. The third exhibit is described as "Portions of Produced Claim File Bates Numbers 093-097 and 099-103," once again of limited use in the absence of context.

7

2.      Mallalieu-Golder, and the Creation and Operation of Premium Finance Trust

MG was an insurance agency that sold various insurance policies, including commercial, personal, life and health insurance policies.  MG also sold financial products, including fixed and variable annuities and mutual funds.  Larry Fiorini was the President and Chief Executive Officer of MG from approximately 1976 until his death in March 2002.  David Eakin was the Vice President of MG from 1989 until November 2002, and Dan Smith was the bookkeeper and computer administrator for MG from 1991 until November 2002.

In approximately 1998, Fiorini created PFT for the purpose of financing premiums[4] for policies sold by MG.[5]  There were two types of outside parties

_____

[4]"In the premium finance business, an insurance policy is purchased by the insured, who makes an initial down payment on the insurance policy.  After a finance arrangement is entered into by the insured and the premium finance company, the premium finance company pays off the balance of the insurance premium.  The insured then pays the amount financed to the premium finance company on a [scheduled] basis."  Gay v. Holland, 78 B.R. 358, 359 (Bankr. M.D. Ga. 1987) (describing a remarkably similar case involving the misuse of funds

8

involved with PFT: those who financed insurance policy premiums through PFT, and those who invested in promissory notes made by PFT.  None of the investors in PFT financed insurance premiums through either PFT or MG; in other words, the two types of outside parties involved with PFT were completely independent of one another.

On one hand, those businesses or individuals who financed insurance premiums through PFT would sign a note with PFT, and money would be transferred from PFT's bank account to MG's bank account.  MG would then pay the individual's insurance premium to the insurance company, and the client would make payments on the note, with interest, to PFT.

On the other hand, individuals who invested in PFT essentially loaned PFT a sum of money in return for the promise of PFT to pay back principal plus interest. At the time of Fiorini's death, there were 167 investors in PFT.  The promissory notes issued by PFT identified the maker of the note as "Premium Finance Trust, a

_____

generated by an unincorporated premium finance business to infuse cash into the parent insurance agency).

[5]  It appears that neither Fiorini nor anyone else involved with PFT's premium financing activities was licensed in Pennsylvania to engage in insurance premium financing.

9

wholly owned subsidiary of Mallalieu-Golder Insurance Agency Inc." (Rec. Doc.
No. 51, Ex. F, at 1.)

In fact, PFT was not a "wholly owned subsidiary" of MG. PFT was neither
a separate corporation nor a separate partnership from MG. (Dep. of David Eakin,
Rec. Doc. No. 51, Ex. B, at 33.) No legal documents were filed with any local,
state, or federal agency regarding the creation of PFT. (Dep. of Eakin, Rec. Doc.
No. 51, Ex. B, at 33.) PFT had no employees, no officers, no board of directors,
and no trustees. (Dep. of Eakin, Rec. Doc. No. 51, Ex. B, at 73 & 84; Dep. of
Dan Smith, Rec. Doc. No. 51, Ex. D, at 34-35.) David Eakin, Vice President of
MG, testified that he believed PFT to be a "part of Mallalieu-Golder" (Dep. of
Eakin, Rec. Doc. No. 51, Ex. B, at 33), and Dan Smith, bookkeeper of MG,
testified that it was his understanding that "Premium Finance Trust was a
department of Mallalieu-Golder Insurance Agency" (Dep. of Smith, Rec. Doc. No.
51, Ex. D, at 35 & 40-41).

The record before the court suggests that PFT ultimately became the vehicle
through which Fiorini perpetrated what MG and PFTIF identify as a Ponzi scheme.
(See Rec. Doc. No. 54, at 4); see generally Cunningham v. Brown, 44 U.S. 424,
425 (1924) (Taft, C.J.) (describing the "remarkable criminal financial career of
Charles Ponzi"); United States v. Masten, 170 F.3d 790, 797-98 (7th Cir. 1999)

(discussing characteristics of a Ponzi scheme).

While PFT was not a legal entity, it did maintain books, records, and a checking account separate from those of MG.  (See Dep. of Eakin, Rec. Doc. No. 51, Ex. B, at 34-36.)  Although it is unnecessary here to describe the details of how money flowed between PFT and MG, it is clear that cash generated through the operation of PFT was commingled with MG's general account in order to pay MG's operating expenses.  Dan Smith testified at his deposition that while it was his understanding that PFT was initially designed to finance premiums, "the use of the money [generated by PFT] changed."  (Dep. of Smith, Rec. Doc. No. 51, Ex. D, at 49.)  At some point in time, PFT ceased to finance premiums, and cash generated through the making of promissory notes was transferred from PFT to MG at the direction of Fiorini in order to meet the financial obligations of MG.  (See generally Dep. of Smith, Rec. Doc. No. 51, Ex. D, at 46-77.)

3.   Uncovering the Fraud and Alerting Investors

When Larry Fiorini unexpectedly died in March 2002, David Eakin undertook a review of the financial state of MG and PFT.  He discovered that "the amount of the obligations owed to investors . . . far exceed[ed] the current assets available to repay the same."  (Rec. Doc. No. 51, Ex. G.)  Eakin testified in his deposition that when he discovered that "PFT was grossly underfunded," he

11

notified the Federal Bureau of Investigation.  (Rec. Doc. No. 51, Ex. B, at 88-89.)

On April 10, 2002, Eakin sent a letter to the holders of promissory notes issued by PFT (the "Eakin letter").  (Rec. Doc. No. 51, Ex. G.)  Therein, Eakin disavowed any prior knowledge of the financial state of PFT and MG, alerted the investors to the ongoing FBI investigation, and informed investors that neither principal nor interest would be paid until the investigation had concluded and the true financial status of MG and PFT was determined.

4.    The Class Action Lawsuits

Three class action suits were brought by various investors in PFT after the mailing of the Eakin letter: the first Marshall action, the Semo action, and the second Marshall action.  MG seeks a defense and indemnity from Executive Risk with respect to all three of the class action suits.

The first Marshall action is a suit "to obtain monetary damages from Defendant-Premium Finance Trust and Defendant-Mallalieu-Golder Insurance Agency, Inc. resulting from the Defendants [sic] breach of fiduciary duty and breach of contract regarding the Defendants [sic] failure to make payments out of the Premium Finance Trust."  (Complaint, First Marshall Action, Rec. Doc. No. 1, Ex. A, at 1.)

The first Marshall action, brought "on behalf of all persons who were

12

investors in the Defendant-Premium Finance Trust," alleges that "all investors in the Premium Finance Trust are entitled to principal and interest payments pursuant to Promissory Notes" issued by PFT, and maintains "that the Defendants wrongfully and erroneously ceased making payments pursuant to the terms of the Promissory Note between the Defendants and all Class members."  (Complaint, First <u>Marshall</u> Action, Rec. Doc. No. 1, Ex. A, at ¶¶ 15, 20-21.)  Essentially, the first <u>Marshall</u> action complains that those who invested in promissory notes made by PFT were never paid, or were not paid in full, and the failure to pay constitutes "a breach of the agreement between the parties" and "a breach of fiduciary duty on the part of the Defendants."  (Complaint, First <u>Marshall</u> Action, Rec. Doc. No. 1, Ex. A, at ¶¶ 8-9.)

Class plaintiffs in the first <u>Marshall</u> action seek damages equal to the amounts owed the class members pursuant to the terms of the promissory notes, plus interest, plus costs of suit and reasonable attorney fees.  Class plaintiffs additionally seek an accounting of all assets of MG and PFT.

The <u>Semo</u> action (<u>see</u> Amended Complaint, Rec. Doc. No. 10, Attachment 1) was initially filed against John Bausch and others.  The <u>Semo</u> action alleged that Bausch, a securities broker, and his employers negligently, and in breach of fiduciary duty, recommended that their customers invest in promissory notes

13

issued by PFT.  Bausch joined MG, the estate of Larry Fiorini, David Eakin, and

Dan Smith as defendants in the <u>Semo</u> action (<u>see</u> Amended Complaint, Rec. Doc.

No. 10, Attachment 2), and MG has requested that Executive Risk provide a

defense and indemnity with respect to that joinder.

 Finally, the second <u>Marshall</u> action alleges that David Eakin and Dan Smith

"owed a duty . . . to provide . . . true and accurate information concerning the

Premium Finance Trust."  (Complaint, Second <u>Marshall</u> Action, Rec. Doc. No. 21,

Ex. 3, at ¶ 9.)  Class plaintiffs in the second <u>Marshall</u> action allege that Eakin and

Smith were negligent because they:

> (a) Failed to advise Plaintiff that the assets of the
> Premium Finance Trust were not invested in any interest-
> bearing account or stock;
> (b) Failed to advise Plaintiff that the funds of the
> Premium Finance Trust were not securely invested;
> (c) Failed to warn Plaintiff that the aforementioned
> trust was not licensed by the Commonwealth of
> Pennsylvania;
> (d) Failed to advise Plaintiff that the funds of the
> Premium Finance Trust were being utilized for the day to
> day operations of the Mallalieu-Golder Insurance Agency,
> Inc..

(Complaint, Second <u>Marshal</u> Action, Rec. Doc. No. 21, Ex. 3, at ¶ 12.)

 Executive Risk has denied all requests for a defense and indemnity with

respect to the three class actions, and MG filed this declaratory judgment action

against Executive Risk seeking a defense and indemnity with respect to those

claims.

5.      The Policy

MG bought an "Insurance Agents and Insurance Brokers Professional

Liability and Employment Practices Liability Policy" from Executive Risk.  The

Declarations identify "Mallalieu-Golder Insurance Agency" as the named insured.

The application for the Policy, signed by Fiorini, did not mention PFT or

promissory notes, and indicated that MG did not have any subsidiaries in July

1999.  On its application for the Policy, the only financial products MG claimed to

sell were fixed annuities, variable annuities, and mutual funds.

A copy of the Policy was submitted as an exhibit to Executive Risk's motion

for summary judgment.  (Rec. Doc. No. 51, Ex. A.)  We set forth relevant

provisions below.

Section I of the Policy provides coverage, described in part as:

## I. INSURING AGREEMENTS

(A)     The Underwriter will pay on behalf of the
        **Insured(s) Loss** which the **Insureds** become
        legally obligated to pay as a result of **Claims** first
        made against them and reported in writing to the
        Underwriter during the **Policy Period** or, if
        applicable, the Extended Reporting Period, for
        **Wrongful Act(s)** first committed by them on or

after the Retroactive Date stated in ITEM 7(a) of the Declarations.

(Section I of the Policy, Rec. Doc. No. 51, at 11.)

Section II of the Policy provides the following relevant definitions:

## II. DEFINITIONS

(H)   **"Insured"** means:
(1) the **Named Insured**;
(2) any **Insured Subsidiary**;
(3) any natural person who was or is a director, officer, member, manager, employee or partner of the **Named Insured** or of any **Insured Subsidiary**, but only while such person was or is acting within the scope of his or her duties as such . . . .

(I)   **"Insured Subsidiary"** means:
(1) any **Subsidiary** of the **Named Insured** as of the **Inception Date** which is identified as such on an application which is attached to and forms part of this Policy;
(2) any **Subsidiary** created by the **Named Insured** after the **Inception Date**;
(3) any **Subsidiary** acquired by the **Named Insured** after the **Inception Date**; . . . .

(J)   **"Loss"** means judgments or settlements negotiated with the approval of the Underwriter; provided that **Loss** will not include . . . .

(O)   **"Professional Services"** means only insurance services performed for others for a fee or commission as an insurance agent, insurance

16

broker, managing general agent, general agent, surplus line broker, wholesale insurance broker, reinsurance intermediary, underwriting manager, program administrator, insurance consultant, or notary public, including premium financing, claims adjusting, claims administration, and risk management. For purposes of this definition, the term "others" will not include any **Insured**, any entity owned or controlled by any **Insured**, including but not limited to any **Subsidiary**, any person or entity which owns or controls or is under common ownership or control of any **Insured** or any entity of which any **Insured** is a director, officer, member, manager, partner or shareholder.

(R)   **"Subsidiary"** means an entity during that period of time in which the **Named Insured** owns or controls, directly or through one or more **Subsidiaries**, the right to elect or appoint more than fifty percent (50%) of such entity's directors, trustees, members, or board of management.

(S)   **"Wrongful Act"** means any actual or alleged act, error, omission, or breach of duty by an **Insured** solely in such **Insured's** performance of, or failure to perform, **Professional Services**.

(Section II of the Policy, Rec. Doc. No. 51, Ex. A, at 13-16.)

Endorsement No. 3 to the Policy amends the definition of "Professional

Services":

(1)   The term "Professional Services," as defined in Section II Definitions of the Policy, is amended to include services performed for others for a fee

17

and/or commission as a registered representative,
as defined in the by-laws of the National
Association of Securities Dealers, Inc., but only in
connection with the sale or purchase of the
following products:

Fixed annuities, variable annuities, and mutual
funds.

(Endorsement No. 3 to the Policy, Rec. Doc. No. 51, Ex. A, at 7.)

### III.  Executive Risk's Arguments in Favor of Summary Judgment

Executive Risk has briefed three principal arguments in support of its motion

for summary judgment.  We examine each in turn.

3. <u>Executive Risk's First Argument: There is no coverage under the Policy for
MG's claims because PFT is neither a named insured nor an "insured
subsidiary" as defined by the Policy.</u>

The promissory notes issued by PFT identify PFT as "a wholly owned

subsidiary of Mallalieu-Golder Insurance Agency Inc."  (Sample Promissory Note,

Rec. Doc. No. 51, Ex. F.)  However, as discussed above, PFT was not "a wholly

owned subsidiary" of MG.

The parties agree, and it is apparent to the court, that PFT is not an "insured

subsidiary" of MG.  PFT is not a subsidiary of MG at all, as defined by either the

Policy[6] or Black's Law Dictionary[7].  The exact legal status of PFT is unclear; it had

―――――――――――――――

[6]The Policy definition of "subsidiary" is recited above in part II, § 5 of this

no independent corporate form, but did maintain its own bank account.  PFT is

perhaps most analogous to a "shell company," without the formality of corporate

status.  <u>See generally</u> 17 C.F.R. § 230.405 (2006) (defining "shell company").

Regardless of what PFT may be, it is not a subsidiary of MG, and Plaintiffs are

therefore not entitled to a defense and indemnity on the basis that PFT is an

"insured subsidiary" of MG.

Having decided that PFT is not an "insured subsidiary" of MG, we must

address Executive Risk's argument that PFT was not a "named insured" under the

Policy.  It is undisputed that the words "Premium Finance Trust" never appear in

either MG's application for the Policy or the Policy language itself.  However, there

are genuine issues of material fact regarding the actual relationship between PFT

and MG.  David Eakin, Vice President of MG, testified that he believed PFT to be

a "part of Mallalieu-Golder."  (Dep. of Eakin, Rec. Doc. No. 51, Ex. B, at 33.)

Dan Smith, bookkeeper of MG, testified that it was his understanding that

_____

memorandum.

[7]Black's Law Dictionary defines "subsidiary corporation" as: "One in which

another corporation (<u>i.e.</u> parent corporation) owns at least a majority of the shares,

and thus has control.  Said of a company more than 50 percent of whose voting

stock is owned by another."  Black's Law Dictionary 1428 (6th ed. 1990).

19

"Premium Finance Trust was a department of Mallalieu-Golder Insurance Agency."

(Dep. of Smith, Rec. Doc. No. 51, Ex. D, at 35 & 40-41.)

Executive Risk argues that MG "was not legally obligated to make any

payments pursuant to the promissory notes [issued by PFT] and, therefore, cannot

be held liable for a failure to make such payments."  (Rec. Doc. No. 50, at 14.)

MG argues in response that there is "no legal difference" between PFT and MG,

and that "the use of a pseudoname [sic] of Premium Finance Trust by Mallalieu-

Golder Insurance Company results in no legal significance."  (Rec. Doc. No. 54, at

4.)

The record does not permit the court to decide this question with certainty.

As discussed above, at the summary judgment stage, "the judge's function is not

himself to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  A genuine

issue of material fact is one that may reasonably be resolved in favor of either party.

Id.  "The inquiry is whether the evidence presents a sufficient disagreement to

require submission to the jury or whether it is so one sided that one party must, as a

matter of law, prevail over the other."  Id.

This question of whether PFT was a part of MG is not so one-sided that

either plaintiffs or defendant must prevail as a matter of law.  If a jury found that

PFT was a "department" or a "part of" MG, as described by Smith and Eakin, it is possible that a jury could decide that PFT was included as an "insured" and thereby covered by the Policy.[8]

Because genuine issues of material fact exist as to the legal status of PFT and the precise relationship between PFT and MG, Executive Risk is not entitled to summary judgment on the basis that PFT is not a named insured of the Policy.

4.    Executive Risk's Second Argument: There is no coverage under the Policy for MG's claims because the failure to make payments pursuant to the terms of the promissory notes is not a "Professional Service" as defined by the Policy.

The Policy insured MG against loss "which the **Insureds** become legally obligated to pay as a result of **. . . Wrongful Act(s)**" committed by the insureds. (Section I of the Policy, Rec. Doc. No. 51, at 11.)   A "wrongful act" is "any actual or alleged act, error, omission, or breach of duty by an **Insured** solely in such **Insured's** performance of, or failure to perform, **Professional Services**." (Section II(S) of the Policy, Rec. Doc. No. 51, Ex. A, at 16.)   "Professional

_____

[8]The resolution of this question, of course, would not be dispositive.  If a jury found that PFT was a "department" of MG and therefore covered by the Policy, plaintiffs would still have to prove that the actions complained of in the class action suit constituted "wrongful acts" as defined by the Policy.

Services" is specifically defined in the Policy, as "only insurance services performed for others for a fee or commission as an insurance agent . . . including premium financing." (Section II(O) of the Policy, Rec. Doc. No. 51, Ex. A, at 15.)

While recognizing that "premium financing" is included in the definition of "Professional Services," Executive Risk argues that the class action plaintiffs do not complain of wrongful acts with regard to the financing of premiums. Rather, Executive Risk argues that the class action plaintiffs complain of PFT & MG's failure to pay on the promissory notes issued by PFT. The making of promissory notes is not included in the definition of "Professional Services," and the financial arrangement between PFT and its investors did not involve "the sale or purchase of . . . [f]ixed annuities, variable annuities, [or] mutual funds." (See Endorsement No. 3 to the Policy, Rec. Doc. No. 51, Ex. A, at 7) (amending the definition of "Professional Services" to include " services performed for others for a fee and/or commission as a registered representative, as defined in the by-laws of the National Association of Securities Dealers, Inc., but only in connection with the sale or purchase of the following products: Fixed annuities, variable annuities, and mutual funds.") Executive Risk argues that the foundation of the class action lawsuits is the failure of PFT and/or MG to repay the promissory notes, a failure that was totally unrelated to the financing of insurance premiums.

Plaintiffs argue that the Policy "[b]y definition . . . obviously covers all aspects of premium financing." (Rec. Doc. No. 54, at 7.) In support of this argument, plaintiffs posit the following: MG decided to engage in premium financing, an activity included in the definition of "Professional Services." In order to engage in premium financing, MG had to find cash to finance the endeavor. The strategy undertaken by MG to create that cash was the issuance of promissory notes made by PFT. Therefore, the promissory notes issued by PFT "were part and parcel of a method of premium financing selected by Mallalieu-Golder Insurance Agency, Inc. and, therefore, a means of providing professional services." (Rec. Doc. No. 54, at 6-7.)

We disagree. "The burden of proving that a particular claim falls within the coverage of a policy is on the insured." Jacobs Constructors, Inc., 264 F.3d at 376 (citing Erie Ins. Exch., 533 A.2d at 1366-67). Of course, at the summary judgment stage, we draw all reasonable inferences and any ambiguities in favor of the nonmoving party. Am. Flint Glass Workers Union, 62 F.3d at 578. We thus have to decide whether, after we draw all reasonable inferences and any ambiguities in favor of MG, MG has carried its burden of proving that the claims alleged in the three class action suits fall within the coverage of the Policy.

MG argues that the making of the promissory notes, in an effort to raise

capital to finance premiums, falls within the meaning of "premium financing," which

is a "Professional Service."  MG has cited no case law that would so broadly

interpret the phrase "premium financing."  Furthermore, when we consider the

allegations in the class action complaints, the class plaintiffs do not allege

"wrongful acts" with regard to "premium financing."  Rather, the class plaintiffs

complain of PFT and MG's failure to repay promissory notes.  We analyze the

allegations made in each class action complaint seriatim.

> a.     The First Marshall Action

The first Marshall action alleges that the failure of PFT and MG to make

payments pursuant to the terms of the promissory notes was a breach of the

agreement between the parties, and a breach of fiduciary duty on the part of the

defendants.  "Specifically, representative Plaintiffs maintain that the Defendants

wrongfully and erroneously ceased making payments pursuant to the terms of the

Promissory Note between the Defendants and all Class members."  (Complaint,

First Marshall Action, Rec. Doc. No. 1, Ex. A, at ¶ 21.)

Nowhere within the four corners of the complaint is there language that could

be construed as an allegation that the defendants committed an "error, omission, or

breach of duty" in the "performance of, or failure to perform, Professional

Services."  (Definition of "Wrongful Act," Section II of the Policy, Rec. Doc. No.

24

51, Ex. A, at 16.)  The failure of PFT to make payments on the promissory notes was unrelated to the performance of professional services.

The holders of the promissory notes made by PFT were not the recipients of "insurance services performed . . . for a fee or commission." (Definition of "Professional Services," Section II of the Policy, Rec. Doc. No. 51, Ex. A, at 16.) It is undisputed that none of the holders of promissory notes financed insurance premiums through PFT or MG.  (See Rec. Doc.  No. 52, at ¶ 15; Rec. Doc. No. Rec. Doc. No. 53, at ¶ 15.)   The fact that these individuals loaned money to PFT did not make them clients of MG.

Because the allegations in the first Marshall action, when taken as true, do not state a claim to which the Policy potentially applies, Executive Risk has no duty to defend or indemnify MG with respect to the first Marshall action.

 b. The Semo action

As described in part II, § 4 of this memorandum, the Semo action was initially brought against securities broker John Bausch and his employers, alleging that Bausch was careless, negligent, and/or reckless when he recommended that his clients invest in promissory notes made by PFT.  Bausch joined as additional defendants "Mallalieu-Golder Insurance Agency, Inc., David Eakin, Barbara Fiorini, individually and as executrix of the state of Lawrence A. Fiorini, and Daniel E.

25

Smith."  (Joinder Complaint, appended to MG's Amended Complaint, Rec. Doc.

No. 10, Attachment 2.)


       In his joinder complaint, Bausch alleged the following:

> 8.     Additional defendant Mallalieu was owner of the entity that issued the Notes and is liable to the plaintiffs for the damages, if any, sustained as a result of the negligence and/or fraud [sic] of Mallalieu . . . .

> 9.     Additional defendant Eakin was a principal and owner of Mallalieu and had the duty and responsibility to properly and adequately monitor the affairs of Premium [Finance Trust].

> 10.     Eakin, by commission and omission, engaged in negligent and/or fraudulent conduct with regard to the affairs of Premium in that he knew, or should have known, the actual condition of, and activities taking place at, [PFT] and failed to take any steps to stop and/or curtail the improper and illegal activities at [PFT].

> 16.     Smith provided false and misleading financial information to Bausch that he knew, or should had [sic] known, was false and misleading and had a duty to advise Bausch and the other Note holders that the information provided was false and misleading.

> 17.     The acts and/or omissions of Smith were fraudulent and/or negligent and breached a duty owed by Smith.

(Id. at ¶¶ 8-10, 16-17.)  Bausch also alleged that Larry Fiorini engaged in "negligent and/or fraudulent conduct with regard to the affairs of [PFT] in that he knew, or should have known, the actual condition of, and activities taking place at, [PFT] and failed to take any steps to stop and/or curtail the improper and illegal activities at [PFT]."  (Id. at ¶ 13.)

The allegations in Bausch's joinder complaint do not allege wrongful acts with regard to the provision of professional services, as defined in the Policy. Bausch's complaint relates only to the failure of PFT to satisfy the promissory notes it made; nowhere does Bausch allege that Eakin, Smith, or Fiorini committed an "error, omission, or breach of duty" with regard to "insurance services performed for others for a fee or commission."  (Definitions of "Wrongful Act" and "Professional Services," Section II(S) & (O) of Policy, Rec. Doc. No. 51, Ex. A.)

Eakin's failure to oversee the financial health of PFT is not a failure to perform professional services as defined in the Policy.  Smith's provision of "false and misleading financial information" to Bausch is not an error, omission, or breach of duty with regard to the performance of insurance services.  Fiorini's failure to stop "improper and illegal activities" at PFT is not an allegation that Fiorini committed an "error, omission, or breach of duty" with regard to the performance

of insurance services.

Because the allegations in the <u>Semo</u> joinder complaint, when taken as true, do not state a claim to which the Policy potentially applies, Executive Risk has no duty to defend or indemnify MG with respect to the <u>Semo</u> action.

      c.    <u>The Second Marshall Action</u>

The second <u>Marshall</u> action alleges that Eakin and Smith "owed a duty to Plaintiff to provide to Plaintiff true and accurate information concerning the Premium Finance Trust."  (Complaint, Second <u>Marshall</u> Action, Rec. Doc. No. 21, Ex. 3, at ¶ 9.)  Specifically, the second <u>Marshall</u> complaint alleges that Eakin and Smith:

> (a) Failed to advise Plaintiff that the assets of the Premium Finance Trust were not invested in any interest-bearing account or stock;

> (b) Failed to advise Plaintiff that the funds of the Premium Finance Trust were not securely invested;

> (c) Failed to warn Plaintiff that the aforementioned trust was not licensed by the Commonwealth of Pennsylvania;

> (d) Failed to advise Plaintiff that the funds of the Premium Finance Trust were being utilized for the day to day operations of the Mallalieu-Golder Insurance Agency, Inc..

(Complaint, Second <u>Marshal</u> Action, Rec. Doc. No. 21, Ex. 3, at ¶ 12.)

28

Once again, none of the acts or omissions complained of is an error, omission, or breach of duty with regard to the performance of insurance services for others for a fee or commission.  Failing to advise those who invest in promissory notes is not a failure to perform insurance services.  Failing to warn that the trust was unlicensed is not the failure to perform insurance services.  Failing to warn the investors about the actual use of their investment capital was not a failure to perform insurance services.  The Policy protected MG only against errors, omissions, or breaches of duty with regard to "insurance services performed for others for a fee or commission."  Eakin's and Smith's failure to oversee the issuance and payment of promissory notes is simply not covered by the plain language of the Policy.

Because the allegations in the second <u>Marshall</u> complaint, when taken as true, do not state a claim to which the Policy potentially applies, Executive Risk has no duty to defend or indemnify MG with respect to the second <u>Marshall</u> action.

5.    <u>Executive Risk's Third Argument: There is no coverage under the Policy for MG's claims because MG did not incur a "Loss" as defined by the Policy.</u>

In its third argument, Executive Risk argues that the money received by PFT via promissory notes and then transferred to MG in order to pay MG's operating expenses constitutes an ill-gotten gain to MG, and that because it is against public

policy to use insurance to pay an insured for wrongfully acquired and subsequently

disgorged funds, any amount MG becomes liable to pay to the class action

plaintiffs could not constitute a "loss" as defined by the Policy.

In support of this argument, Executive Risk states the following:

> Mallalieu basically raided Premium Finance's
> account whenever it needed money, in complete disregard
> of Premium Finance's obligations to its investors.
> Therefore, any payment by Mallalieu of the amounts
> owed under the promissory notes can only be
> characterized as restitutionary in nature since Mallalieu
> was never entitled to Premium Finance's funds . . . .
> By appropriating Premium Finance's funds and
> then failing to make payments owed to the investors,
> Mallalieu wrongfully acquired or retained money to which
> it was not entitled."

(Rec. Doc. No. 50, at 25.)

In order to agree with Executive Risk's argument, a necessary antecedent

would be a finding that PFT and MG were separate entities.  If PFT were simply a

"department" of MG, it would be difficult to characterize the movement of money

between the accounts of PFT and MG as an "appropriation" or "raid" by MG.  As

discussed above in part III, § 1 of this memorandum, genuine issues of material

fact exist as to the legal status of PFT and the precise relationship between PFT

and MG.  Those same questions preclude the grant of summary judgment on the

ground that MG appropriated funds from PFT.

30

**CONCLUSION:**

For the foregoing reasons, we will enter summary judgment in favor of

Executive Risk Indemnity Inc., and against Mallalieu-Golder Insurance Agency, Inc

and Premium Finance Trust Investors Fund.  An accompanying order shall issue

forthwith.


s/  James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MALLALIEU-GOLDER                  :
INSURANCE AGENCY, INC.,           :
                                  :        No. 4:CV-03-1155
          Plaintiff,              :
                                  :        (Judge McClure)
     v.                           :
                                  :
EXECUTIVE RISK INDEMNITY,         :
INC., and PREMIUM FINANCE         :
TRUST INVESTORS FUND,             :
                                  :
          Defendants.             :

**O R D E R**

August 9, 2006

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Motion for Summary Judgment filed by Executive Risk

       Indemnity, Inc., is granted.  (Rec. Doc. No. 49.)

2.     The clerk is directed to enter final judgment in favor of Executive Risk

       Indemnity Inc., and against Mallalieu-Golder Insurance Agency, Inc.

       and Premium Finance Trust Investors Fund.

3.      The clerk is directed to close the case file.


                                        s/ James S. McClure, Jr.
                                        James F. McClure, Jr.
                                        United States District Judge